IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MEDFORD DIVISION

**PEGGY IGOU**,

      Plaintiff,                                No. 1:16-cv-00747-MO

      v.                                   OPINION AND ORDER

**COMMISSIONER OF SOCIAL SECURITY**,

      Defendant.

**MOSMAN, J.**,

      Plaintiff Peggy Igou challenges the Commissioner's decision denying her claim for

Disability Insurance Benefits and Supplemental Security Income pursuant to 42 U.S.C. §§ 401-

423 and 1381-1383f.  I have jurisdiction under 42 U.S.C. § 405(g) to review the Administrative

Law Judge's ("ALJ") decision.  For the reasons stated below, I have determined the ALJ's

decision is not supported by substantial evidence in the record, and I REVERSE and REMAND

the decision for further proceedings.

## PROCEDURAL BACKGROUND

      Ms. Igou filed an application for Title II disability insurance benefits and for Title XVI

supplemental security income to the Commissioner on August 9, 2012, alleging a disability onset

date of September 16, 2010.  The claims were initially denied on December 19, 2012, and again

upon reconsideration on April 19, 2013.  Ms. Igou then filed a timely request on June 1, 2013,

for a hearing to review the Commissioner's decision.  An ALJ held a hearing on April 29, 2014,

during which Ms. Igou amended her alleged onset date to July 1, 2012.  The ALJ subsequently

issued a decision on July 14, 2014, in which he denied Ms. Igou's claim for benefits on the basis

that she was not disabled, as defined by the Social Security Act.

## THE ALJ'S FINDINGS

The ALJ made his decision based upon the five-step sequential evaluation process

established by the Secretary of Health and Human Services.  *See Bowen v. Yuckert*, 482 U.S.

137, 140-42 (1987); 20 C.F.R. § 416.920 (establishing the five-step evaluative process for SSI

claims).  As an initial matter, the ALJ determined that Ms. Igou met the insured status

requirements of the Social Security Act through December 31, 2015.  At Step One, the ALJ

determined that Ms. Igou did not engage in substantial gainful activity during the period from her

amended alleged onset date of July 1, 2012, through July 14, 2014.  At Step Two, the ALJ

determined that she had the following severe impairments:  partial coronary artery disease with

one stent placement; diabetes; sleep apnea; and C5-8 mild degenerative disc disease.  At Step

Three, the ALJ determined that Ms. Igou did not have an impairment or combination of

impairments that met or medically equaled the severity of a listed impairment under 20 C.F.R.

Part 404, Subpart P.

Next, the ALJ determined that Ms. Igou had the residual functional capacity to perform

light work, with the following limitations: occasional postural movements; never climb ladders

or work at heights; never work near hazards; no crawling; seldom bend from the waist; walk only

at a slow pace; occasionally perform overhead work above shoulder level bilaterally;

occasionally use foot pedals bilaterally; no exposure to concentrated levels of dusts, odors,

fumes, gases, and temperature extremes; no direct access to cannabis; and only superficial interaction with the general public. In addition, she needs hands-on training for workplace setting changes, although she requires minimal supervision. She can work independently, but with only a few coworkers at a time. She cannot perform security work. Finally, she would be off-task six percent of the workday in small increments.

At Step Four, the ALJ determined that Ms. Igou was unable to perform any past relevant work. Finally, at Step Five, the ALJ determined that, given Ms. Igou's age, education, work experience, and residual functional capacity, jobs existed in significant numbers in the national economy that she could have performed as of her date last insured. Specifically, the Vocational Expert testified that Ms. Igou could work as a small products assembler or a bench hand. Therefore, she was not disabled, as defined by the Social Security Act, at any time through her date last insured.

## STANDARD OF REVIEW

I review the ALJ's decision to ensure the ALJ applied proper legal standards and made findings that are supported by substantial evidence in the record. 42 U.S.C. § 405(g); *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009) (noting that the ALJ's decision must be supported by substantial evidence and not based on legal error). "'Substantial evidence' means more than a mere scintilla, but less than a preponderance; it is such relevant evidence as a reasonable person might accept as adequate to support a conclusion." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (citing *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006)). The decision must be upheld if it is a rational interpretation of the evidence, even if there are other possible rational interpretations. *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir.

1989).  The reviewing court may not substitute its judgment for that of the ALJ.  *Robbins*, 466 F.3d at 882.

## DISCUSSION

Ms. Igou argues the ALJ erred in denying her claim for disability benefits because his decision is not supported by substantial evidence in the record.  Specifically, she claims the ALJ erred at Step Two in failing to include depression, obesity, and lumbar degenerative disc disease as severe impairments.  At Step Three, Ms. Igou argues the ALJ erred in failing to find that she met or equaled Listing 12.04.  Next, she argues the ALJ failed to include all of her restrictions in her residual functional capacity.  As a result, she argues the ALJ failed at Step Five to show there are jobs in the national economy she can perform given her residual functional capacity.

Fundamental to these arguments is Ms. Igou's assertion that the ALJ improperly rejected the opinions of her treating and examining doctors, and her testimony.  Accordingly, I first consider whether the ALJ properly evaluated those pieces of evidence.  Then, I determine whether the ALJ erred during the sequential evaluation process.

As explained below, I find that the ALJ improperly evaluated the medical opinions of Ms. Igou's treating and examining doctors.  He also failed to provide adequate reasons for finding Ms. Igou's testimony not credible.  These errors were not harmless. As a result, the ALJ's findings at Steps Two, Three, and Five are not supported by substantial evidence in the record and must be reassessed.

## I.    The ALJ's Treatment of Treating and Examining Medical Opinions

Ms. Igou argues that the ALJ erred as a matter of law in giving "little weight" to the opinion of her treating doctor, Dr. Byeon, and in rejecting the opinion of Dr. Dixon, a mental health professional who conducted a consultative examination on Ms. Igou.  The Commissioner

argues that the ALJ's reasons for giving limited weight to these opinions are adequate, and, in any event, any error was harmless.

There are three types of medical opinions in Social Security cases: those from treating, examining, and non-examining doctors. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). The medical opinion of a claimant's treating physician is entitled to "special weight" because "he is employed to cure and has a greater opportunity to know and observe the patient as an individual." *Rodriguez v. Bowen*, 876 F.2d 759, 761 (9th Cir. 1989) (citation omitted). Additionally, the opinion of an examining physician is entitled to greater weight than the opinion of a nonexamining physician. *Lester*, 81 F.3d at 830. If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence. *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005) (citing *Lester*, 81 F.3d at 830-31). "The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Magallanes*, 881 F.2d at 751 (citation omitted).

It is well-established that "the ALJ need not accept the opinion of any physician, including a treating physician, if that opinion is brief, conclusory, and inadequately supported by clinical findings." *Thomas v Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002); *see also Crane v. Shalala*, 76 F.3d 251, 253 (9th Cir. 1996) (ALJ may "permissibly reject[] . . . check-off reports that [do] not contain any explanation of the bases of their conclusions"). A "physician's opinion of disability 'premised to a large extent upon the claimant's own accounts of [her] symptoms and limitations' may be disregarded where those complaints have been 'properly discounted.'" *Morgan v. Comm'r Soc. Sec. Admin*, 169 F.3d 595, 602 (9th Cir. 1999) (quoting *Fair v. Bowen*, 885 F.2d 597, 605 (9th Cir. 1989)). However, "an ALJ may not reject an examining physician's

opinion by questioning the credibility of the patient's complaints, 'where the doctor does not

discredit those complaints and supports his ultimate opinion with his own observations.'" *Denby*

*v. Colvin*, 1:15-cv-00191-SB, 2016 WL 917313, at *6 (D. Or. March 8, 2016) (citing *Ryan v.*

*Comm'r of Soc. Sec.*, 528 F.3d 1194 (9th Cir. 2008)).

## A. *Dr. Byeon*

Dr. Byeon completed a physical functional evaluation of Ms. Igou on July 5, 2013. He

diagnosed Ms. Igou with chronic low back pain, chronic neck pain, hands pain, coronary artery

disease, and chronic obstructive lung disease. He assessed her back, neck, and hand pain as

"marked," which, according to the form, meant it had a very significant interference with her

ability to perform one or more basic work-related activities. He assessed her coronary artery

disease and lung disease as "moderate," or having a significant interference with her ability to

perform one or more basic work-related activities. Dr. Byeon further opined that Ms. Igou was

limited to sedentary work, defined as being able to lift a maximum of ten pounds, carry

lightweight articles for up to six hours of an eight hour work day, and walk or stand for only

brief periods. He estimated her limitations would persist for six months if she was able to obtain

medical treatment. Dr. Byeon included a joint motion evaluation chart, which documented his

orthopedic evaluation of Ms. Igou, as well as treatment notes and other diagnostic reports, dating

back to January 2, 2013, as medical evidence from which he derived his opinions.

The ALJ gave little weight to Dr. Byeon's opinions. The ALJ claimed there was "little

objective evidence to support the alleged degree" to which Dr. Byeon assessed Ms. Igou was

limited. Instead, the ALJ believed Dr. Byeon's opinions were largely based on Ms. Igou's

subjective complaints about the severity of her impairments, and the ALJ found her allegations

to be less than fully credible. He also gave reduced weight to Dr. Byeon's opinions because Dr.

Byeon indicated Ms. Igou had carpal tunnel syndrome despite objective medical evidence showing otherwise.

Ms. Igou argues there is evidence in the record to support a history of carpal tunnel syndrome, as examinations and nerve conduction studies by an orthopedic doctor from 2013 showed positive Phalen's and Tinel's signs in her wrists. Additionally, Ms. Igou cites to medical evidence in the record that she argues supports Dr. Byeon's conclusions, including x-rays and MRI scans that show moderate degenerative disc disease in her cervical and lumbar spine. Accordingly, she argues that the ALJ's reasons for giving little weight to Dr. Byeon's opinions are not supported by the record.

The Commissioner responds by arguing that Dr. Byeon only submitted a two-page range of motion report as clinical findings to support his opinion, presumably meaning his opinions about Ms. Igou's limitations could not have been based on clinical findings. Further, the Commissioner asserts that the report itself showed a relatively benign physical examination. Thus, the Commissioner argues, the ALJ reasonably inferred that Dr. Byeon's opinion, including the diagnosis of carpel tunnel syndrome, was based largely on Ms. Igou's subjective complaints and not "significant objective findings." Finally, the Commissioner asserts that any error by the ALJ in evaluating Dr. Byeon's opinions was harmless because Dr. Byeon claimed Ms. Igou's limitations would last for only six months with treatment, and temporary limitations do not constitute an opinion that Ms. Igou was limited to sedentary work for at least twelve months.

After reviewing the record, I have determined that the ALJ failed to provide specific and legitimate reasons for rejecting the opinions of Dr. Byeon. First, the ALJ erred in giving Dr. Byeon's opinions little weight on the grounds that they were based largely on Ms. Igou's subjective complaints instead of objective medical information. The record shows that Dr.

Byeon's opinions were based on his treatment of Ms. Igou over time, his review of treatment notes by an orthopedic specialist, x-rays, an MRI, and his clinical assessment on the day he completed the physical functional evaluation of Ms. Igou. Specifically, his opinions are based on (1) a range of motion evaluation he conducted, which showed that Ms. Igou had reduced range of motion in her back and neck, (2) his treatment notes, which showed she had a reduced range of motion in her neck and spine, (3) a June 18, 2013 orthopedic examination, which also showed reduced range of motion, (4) cervical x-rays, which showed abnormalities in Ms. Hill's C3, C4, C5, C6, and C7 vertebrate, and (5) an MRI from June 7, 2013, which showed additional spinal abnormalities. Accordingly, the ALJ's determination that Dr. Byeon's opinions were based on Ms. Igou's subjective complaints is not supported by substantial evidence in the record, since he considered other objective medical evidence in formulating his medical opinions.

Second, the ALJ erred in determining there was little objective evidence to support the degree to which Dr. Byeon assessed Ms. Igou was limited. Dr. Byeon's most restrictive limitations related to Ms. Igou's ability to sit, stand, walk, push, pull, reach, and stoop because of her chronic low back pain and neck pain, which he assessed would significantly interfere with her ability to perform those activities. Contrary to the ALJ's assertions, these limitations are based on clinical findings from the medical evidence that Dr. Byeon reviewed, and the ALJ failed to provide any medical evidence to support his determination that the findings did not support Dr. Byeon's conclusions. It appears that the ALJ improperly substituted his own lay opinion of what the clinical results showed for that of Dr. Byeon. *See Morales v. Apfel*, 225 F.3d 310, 319 (3rd Cir. 2000) (explaining that "an ALJ should not substitute his lay opinion for the medical opinion of experts"). Thus, the ALJ's determination that there was little objective

evidence to support Dr. Byeon's opinions about the extent of Ms. Igou's limitations is not supported by substantial evidence in the record.

Third, in taking issue with the alleged carpal tunnel diagnosis, the ALJ misread Dr. Byeon's report. Carpal tunnel syndrome is only noted in the "subjective" portion of the report, which lists Ms. Igou's "chief complaints and reported symptoms." In the "diagnosis" section of the report, however, Dr. Byeon does not list carpal tunnel syndrome; instead, he lists "hands pain." Accordingly, the report reflects both the list of subjective complaints made by Ms. Igou and Dr. Byeon's diagnosed illnesses given his objective assessment of the medical evidence. *See Ryan*, 528 F.3d at 1199-1200 (explaining that doctors often record both the patient's subjective complaints and the doctor's own evaluation and clinical observations). The ALJ mistakenly concluded that Dr. Byeon diagnosed Ms. Igou with carpal tunnel syndrome, when he merely transcribed her complaints.

More fundamentally, even if Dr. Byeon had diagnosed Ms. Igou with carpal tunnel syndrome, there is objective medical evidence in the record to support the diagnosis, including nerve conduction studies and orthopedic examinations. For example, a June 18, 2013 orthopedic evaluation that Dr. Byeon attached to his functional report noted positive Tinel's signs over bilateral carpal tunnel. Further testing, including a nerve conduction study from the fall of 2013, also supported a diagnosis of carpal tunnel syndrome. Even though some of the orthopedic records were from a couple of months after Dr. Byeon provided his assessment, those records were available to the ALJ and provide objective medical evidence that would support a finding of carpal tunnel syndrome had Dr. Byeon actually made that diagnosis. But again, he did not do so. Accordingly, the ALJ's erroneous conclusion that Dr. Byeon's opinions should be afforded

little weight because he diagnosed Ms. Igou with carpal tunnel syndrome is not a legitimate reason to reject his opinions, and it is not supported by substantial evidence.

Finally, the ALJ's error in giving little weight to Dr. Byeon's opinions is not harmless. The Commissioner misinterprets the importance of Dr. Byeon's opinion that Ms. Igou's current limitations would persist for only six months with treatment. To be disabled under the Social Security Act, an individual's impairments must have lasted or be expected to last for a continuous period of at least twelve months. 42 U.S.C. §§ 423(d)(1)(A). Dr. Byeon's statement supports a finding that Ms. Igou may get better in less than twelve months with proper treatment. But it was made on June 10, 2013, while Ms. Igou alleges an onset date of July 2012. Thus, Ms. Igou's impairments may have lasted for almost a year before Dr. Byeon's statement. With the additional six months that Dr. Byeon estimates her limitations could persist with proper therapy, it is clear that Ms. Igou's impairments could be expected to last for at least twelve months.

## B. *Dr. Dixon*

Dr. Dixon performed a consultative examination on Ms. Igou in October 2012. He diagnosed her with major depressive disorder after performing a mental status examination. The mental status examination included an assessment of Ms. Igou's appearance, behavior, affect and mood, intellectual functioning, thought content, memory, and judgment. During the examination, he found Ms. Igou's mood was "bunted, with sadness and depression noted." He also noted "increased lability of affect with mild tearfulness." Based on his findings from the examination, Dr. Dixon opined that Ms. Igou was markedly impaired in her ability to (1) complete a normal workday or workweek without interruptions from her psychologically-based symptoms, (2) deal with the usual stress encountered in the workplace, (3) perform simple and

repetitive tasks, and detailed and complex tasks, (4) accept instructions from a supervisor, and (5) interact with coworkers.

The ALJ rejected Dr. Dixon's opinion for several reasons. First, he found Dr. Dixon's diagnosis and limitations to be inconsistent with Ms. Igou's performance during her mental status examination. Second, the ALJ thought Dr. Dixon "appear[ed] to rely solely on the claimant's subjective complaint's[sic] regarding the severity of her impairments." Finally, the ALJ stated that Dr. Dixon's opinion was not supported by any objective medical evidence in Ms. Igou's file.

Dr. Dixon, as a psychologist, may opine on the "nature and severity of [Ms. Igou's] impairment(s)." 20 C.F.R. § 416.927(a)(2) (explaining that medical opinions include statements about what a claimant "can still do despite impairment(s)" and her "physical or mental restrictions"). As an examining physician, his opinions are entitled to greater weight than non-examining physicians, and his conclusions, to the extent they conflict with other medical opinions in the record, can only be rejected by specific and legitimate reasons. *Ryan*, 528 F.3d at 1198; *see also* 20 C.F.R. § 416.927(c)(1) ("Generally, we give more weight to the medical opinion of a source who has examined you than to the medical opinion of a medical source who has not examined you."). Further, the ALJ may reject his "opinion if it is contradicted by clinical evidence." *Ryan*, 528 F.3d at 1198. The opinion cannot be rejected by "questioning the credibility of the patient's complaints where the doctor does not discredit those complaints and supports his ultimate opinion with his own observations." *Id.* at 1199-1200 (citation omitted) (finding that the ALJ erred when there was nothing in the record to suggest the doctor disbelieved the claimant's description of her symptoms or that the doctor relied on those descriptions more heavily than his own clinical observations).

Ms. Igou argues that the ALJ's reasons for discounting Dr. Dixon's opinions are not supported by the record. She asserts that Dr. Dixon's conclusions were supported by the results of her mental status exam and other medical evidence in the record. The Commissioner responds that the ALJ's reasons are supported by substantial evidence because the findings on the mental status examination "were relatively mild," as compared to the concluded limitations. Further, the Commissioner argues the ALJ reasonably inferred that Dr. Dixon's conclusions were based on Ms. Igou's self-reports, since his conclusions were not supported by his own examination. Finally, to the extent that the ALJ erred in failing to find a severe mental impairment at Step Two, the Commissioner argues that such error was harmless because the ALJ included all of Ms. Igou's credible mental limitations in the residual functional capacity finding.

Here, the ALJ failed to provide specific and legitimate reasons for discounting the opinions of Dr. Dixon. The ALJ is not a medical expert and his opinion that Dr. Dixon's major depressive diagnosis is inconsistent with the results of the mental status examination is not supported by proper medical evidence. *See Smith v. Colvin*, 3:14-cv-01210-PA, 2016 WL 680535, at *7 (D. Or. February 19, 2016) ("The ALJ is not a medical expert and may not make his own medical assessment beyond that demonstrated by the record." (citation omitted)); *see also Schmidt v. Sullivan*, 914 F.2d 117, 118 (7th Cir. 1990) ("[J]udges, including administrative law judges of the Social Security Administration, must be careful not to succumb to the temptation to play doctor."); *Day v. Weinberger*, 522 F.2d 1154, 1156 (9th Cir. 1975) (explaining that an ALJ is not a medical expert). Similarly, the Commissioner's assertion that the ALJ's reasoning is valid because the results of Ms. Igou's mental status examination were relatively mild is not supported by a valid medical authority.

Additionally, the ALJ did not provide clear reasoning for why he believed Dr. Dixon relied solely on Ms. Igou's subjective complaints in formulating his opinions. Of course, part of a psychological examination will necessarily be based on an individual's subjective complaints. But, as already stated, Dr. Dixon completed a mental status examination, which included both an interview and objective testing, and his report indicates he based his diagnostic impression and conclusions at least in part on that examination. In addition, to the extent that Dr. Dixon relied in part on Ms. Igou's statements in formulating his opinions, his report does not suggest he was concerned that she was malingering, and there is no support in the record for the proposition that he relied solely on her subjective complaints or that he based his conclusions more on her complaints than on his objective testing and observations.

Finally, the ALJ's statement that Dr. Dixon's opinions are not supported by any objective medical evidence in the record is also not consistent with the record. For example, in April 2011, Ms. Igou was prescribed Lexapro to help with anxiety and depression. A treatment provider in December 2012, noted Ms. Igou showed signs of depression, sparking a possible diagnosis of major depressive disorder. Further, a state agency reviewing doctor found that one of Ms. Igou's severe impairments included an affective disorder, which resulted in moderate restrictions in her activities of daily living, ability to maintain concentration, persistence, or pace, and complete a normal workday and workweek without interruptions from psychologically-based symptoms. The reviewing psychologist also found mild restrictions in Ms. Igou's ability to maintain social functioning. Based on this record, the ALJ's statement that the record did not contain *any* objective medical evidence that supported Dr. Dixon's opinions is quite simply unfounded and not supported by the record.

As a result of improperly rejecting Dr. Dixon's diagnosis of major depressive disorder, the ALJ improperly rejected Dr. Dixon's opinion of Ms. Igou's limitations in formulating her residual functional capacity. In fact, the ALJ must evaluate her "mental impairments via a special psychiatric review technique outlined in 20 C.F.R. §§ 404.1520a, 416.920a" so long as she has a "colorable claim of mental impairment." *Angevine v. Colvin, 542 Fed. Appx.* 589, 591 (9th Cir. 2013) (citing *Keyser v. Comm'r Soc. Sec. Admin*, 648 F.3d 721, 726 (9th Cir. 2011)) (finding a colorable claim of mental impairment where the claimant was diagnosed with a mental impairment and clinical testing supported the diagnosis). The psychiatric review technique requires the ALJ to follow a specific process to make specific findings and conclusions in his opinion about the severity of Ms. Igou's mental impairment and degree of her functional limitations. 20 C.F.R. § 404.1520a.

Here, ALJ rejected Dr. Dixon's diagnosis and only included cognitive and social limitations in Ms. Igou's residual functional capacity to give her "the benefit of the doubt." Specifically, he limited her to superficial interaction with the public, found that she would need hands-on training with workplace setting changes, and noted that she would be off-task six percent of the workday in small increments. These restrictions are, quite simply, much less severe than those opined by Dr. Dixon, and the ALJ failed to point to any medical evidence to support the less severe limitations over those opined by Dr. Dixon. Moreover, he failed to explain how those limitations resulted from the psychiatric review technique as required by 20 C.F.R. 404.1520a.

The ALJ's error in rejecting Dr. Dixon's opinions is not harmless. In rejecting Dr. Dixon's diagnosis, the ALJ failed to properly administer the psychiatric review technique. This resulted in additional errors and flawed analysis at Steps Two, Three and Five.

## II.     The ALJ's Assessment of Ms. Igou's Credibility

Ms. Igou testified that she experiences weakness and low energy from her heart condition, she has severe back pain, which radiates into her hips and knees, she has neck pain, and her legs swell.  Consequently, she cannot stand for more than a few minutes without getting nausea from back pain, she spends a lot of time in bed but has trouble sleeping, and she can sit for only about thirty minutes before her legs start to get numb.  She claims she must regularly elevate her legs to resolve the numbness and reduce swelling. Ms. Igou also testified that she needs help with grocery shopping, she has to stretch every 45 minutes if she rides in a car, she can lift about eight pounds at most, and she can walk 25 to 50 feet and stand for ten minutes. The ALJ did not find the degree of Ms. Igou's alleged symptoms to be fully credible.

When a claimant has medically documented impairments that could reasonably be expected to produce some degree of the symptoms complained of, and the record contains no affirmative evidence of malingering, "the ALJ can reject the claimant's testimony about the severity of . . . symptoms only by offering specific, clear and convincing reasons for doing so." *Smolen v. Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996).  A general assertion that the claimant is not credible is insufficient; the ALJ must "state which [] testimony is not credible and what evidence suggests the complaints are not credible." *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993).  The reasons proffered must be "sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony." *Orteza v. Shalala*, 50 F.3d 748, 750 (9th Cir. 1995).

In assessing a claimant's credibility, the ALJ may consider objective medical evidence and the claimant's treatment history, as well as any unexplained failure to seek treatment or follow a prescribed course of treatment.  *Smolen*, 80 F.3d at 1284.  Additionally, the ALJ may

employ ordinary techniques of credibility evaluation, such as the claimant's reputation for lying and prior inconsistent statements concerning the alleged symptoms. *Id.* If the "ALJ's credibility finding is supported by substantial evidence in the record, [the court] may not engage in second-guessing." *Thomas*, 278 F.3d at 959.

Here, the ALJ determined that Ms. Igou's medically determinable impairments could reasonably be expected to cause some of her alleged symptoms, and he did not point to any evidence of malingering. But he found her statements concerning the intensity, persistence and limiting effects of the symptoms not entirely credible for several reasons. He believed the alleged severity of her impairments was not consistent with objective medical evidence in the record. He also believed that her alleged respiratory problems were inconsistent with her failure to quit smoking. The Commissioner argues that the ALJ also based his credibility determination on inconsistencies with Ms. Igou's testimony about her activities of daily living, but this is unclear from the ALJ's decision. Ms. Igou argues that the ALJ erred by failing to give adequate reasons for discrediting her testimony. For the reasons explained below, I agree with Ms. Igou and find that the ALJ failed to give adequate reasons for finding her testimony not credible.

The ALJ relied heavily on treatment records from Dr. Kobayashi, an orthopedic specialist, in determining that Ms. Igou's statements were not fully credible. Specifically, he noted that after reviewing imaging of Ms. Igou's cervical and lumbar spine, Dr. Kobayashi only recommended physical therapy. According to the ALJ, Dr. Kobayashi did not recommend surgery or steroidal injections in Ms. Igou's spine because Dr. Kobayashi determined her condition was not as severe as she alleged.

The ALJ's reasons for finding Ms. Igou's statements not credible are not supported by the record. In making his findings, the ALJ reviewed treatment records from Dr. Kobayashi

from May and June 2013, which related to Ms. Igou's back and neck pain. There, Dr. Kobayashi prescribed Cymbalta for her chronic musculoskeletal complaints. He also ordered an MRI. He noted that she had tried physical therapy in recent months but was unable to tolerate it due to pain. But, because he believed she could benefit from further conditioning, he prescribed additional physical therapy. Dr. Kobayashi deferred giving Ms. Igou an injection at that time because he was concerned about a reaction with other medication she was taking for her cardiovascular problems.

Contrary to the ALJ's statements, Dr. Kobayashi did not discuss surgical options, nor did he note that he did not believe her pain was as severe as she alleged. The only hint that Dr. Kobayashi had any reservations about Ms. Igou's pain allegations was his note in a treatment record that "her described leg symptoms certainly are disproportionately great" with respect to what he saw on the MRI. He noted, however, that her symptoms could be caused by a disc protrusion, which he could not conclusively determine from the MRI. According to the treatment note, then, Dr. Kobayashi was uncertain of the cause of Ms. Igou's leg symptoms; there is no affirmative statement that he thought she was not actually experiencing those symptoms or that she was otherwise malingering. Based on this record, the ALJ's reasons for discounting Ms. Igou's credibility based on Dr. Kobayashi's treatment records are far from clear and convincing.

Additionally, the ALJ found that Ms. Igou's testimony about her respiratory problems was inconsistent with her failure to quit smoking. On the surface, it is unclear why Ms. Igou's failure to quit smoking makes her complaints about having difficulty breathing not credible. As a matter of logic, it seems credible that a smoker may experience respiratory problems. To the extent that the ALJ believed Ms. Igou's respiratory impairments would cease if she quit

smoking, he must clearly state so, and he must point to medical evidence supporting that finding. *See Byrnes v. Shalala*, 60 F.3d 639, 641 (9th Cir. 1995) (explaining that the ALJ must make specific findings based on substantial evidence in the record that a claimant could return to work if he stopped smoking). He did not do so. Thus, this reasoning is not clear and convincing for finding Ms. Igou's testimony about her respiratory problems not credible.

Finally, the Commissioner asserts that the ALJ also based his credibility finding on his determination that Ms. Igou's alleged symptoms were not consistent with her activities of daily living. Specifically, her testimony about performing some household chores, taking care of her pet, preparing meals for herself several times a week, driving a car, and going grocery shopping once or twice a week were presumably inconsistent with the degree of disability that she alleged. It is not clear from the ALJ's opinion, however, that he based his credibility finding on Ms. Igou's testimony about her activities of daily living at all. Instead, the ALJ simply stated that her residual functional capacity was consistent with her activities of daily living. Regardless of whether that is true, to the extent the ALJ found Ms. Igou not credible because he believed her testimony about her daily activities was inconsistent with her alleged degree of disability, the ALJ must clearly state that finding and provide clear and convincing reasons, supported by evidence in the record, to support that credibility determination. *See Brown-Hunter v. Colvin*, 806 F.3d 487, 489 (9th Cir. 2015). In other words, he must clearly explain how Ms. Igou's activities of daily living conflict with her alleged symptoms and limitations. He did not do so here, and the Commissioner cannot do so for him.

### III.    Errors in the Sequential Evaluation Process

Ms. Igou argues that the ALJ erred at Steps Two, Three, and Five of the sequential evaluation process because his findings are erroneous given his inadequate treatment of the

medical opinions from Dr. Dixon and Dr. Byeon, and his treatment of Ms. Igou's testimony about her limitations. She argues that if the ALJ had properly evaluated that evidence, he would have found additional severe impairments at Step Two, determined that she met listing 12.04 at Step Three, and found that she had a more limited residual functional capacity, requiring a finding of disability at Step Five. As explained above, the Commissioner argues that the ALJ's errors in evaluating Dr. Byeon and Dr. Dixon's opinions were harmless because the ultimate decision would have remained the same even if their opinions were properly evaluated.

For the reasons explained above, I reject the argument that the errors were harmless. The ALJ's improper evaluation of Dr. Dixon and Dr. Byeon's opinions, as well as Ms. Igou's testimony, necessarily means that the ALJ's findings during the sequential evaluation process are not supported by substantial evidence in the record.

## IV.     Remand

Because the ALJ's findings are not supported by substantial evidence in the record, the disability determination cannot stand. I have the discretion under 42 U.S.C. § 405(g) to decide whether to remand this case for further proceedings or for an award of benefits. *Holohan v. Massanari*, 246 F.3d 1195, 1210 (9th Cir. 2001) ("The decision whether to remand for further proceedings or for an award of benefits is within [the Court's] discretion."). A remand for further proceedings is typically "unnecessary if the record is fully developed and it is clear from the record that the ALJ would be required to award benefits." *Id.* In other words, a remand for an award of benefits is appropriate when no useful purpose would be served by further administrative proceedings. *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1099-1100 (9th Cir. 2014).

In order to determine whether an immediate award of benefits is proper, the Court must conduct a "credit-as-true" analysis on the evidence that was improperly rejected by the ALJ. *Strauss v. Comm'r of Soc. Sec. Admin.*, 635 F.3d 1135, 1137-38 (9th Cir. 2011). As such,

> . . . the district court should credit evidence that was rejected during the administrative process and remand for an immediate award of benefits if (1) the ALJ failed to provide legally sufficient reasons for rejecting the evidence; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

*Id.* at 1138 (citation omitted).

Here, I have already determined that the ALJ failed to provide legally sufficient reasons for rejecting Dr. Byeon and Dr. Dixon's opinions, and Ms. Igou's testimony. Accordingly, I must now determine whether any outstanding issues need to be resolved before a determination of disability can be made, and whether it is clear that the ALJ would have to find Ms. Igou disabled if the evidence was credited as true. After reviewing the record, I have determined it is not clear from the record that the ALJ would be required to find Ms. Igou disabled as of her alleged onset date, even if the evidence is credited as true.

If Dr. Byeon's opinion is credited as true, Ms. Igou would be limited to lifting a maximum of ten pounds, and walking or standing for only brief periods. This is consistent with Ms. Igou's testimony about her inability to stand for significant periods of time and her need to keep her legs elevated to reduce numbness and swelling. Based on these limitations, Ms. Igou would be limited to performing work at an exertional category of "sedentary." *See SSR 83-10*, 1983 WL 31251 (1983) (defining "Sedentary work" as "involving lifting no more than 10 pounds at a time," with periods of walking or standing totaling no more than about two hours of an eight-hour workday, whereas "Light work" allows for lifting up to 20 pounds at a time and a

"good deal of walking or standing").  If Ms. Igou's testimony is credited as true, she is unlikely

to do even a full range of sedentary work because she cannot sit for long periods of time, and

sedentary work assumes the ability to sit for approximately six hours of an eight-hour workday.

*Id.*  Finally, Dr. Dixon's opinion, if credited as true, would further erode Ms. Igou's ability to

work at any exertional level because her array of marked non-exertional impairments would

result in her being off-task during much of the workday.

Given Ms. Igou's high school education, if her maximum sustained work capability is

limited to sedentary work, she would be found disabled under Medical Vocational Rule 201.14

as of August 2014, when she became 50 years old.  20 C.F.R. Part 404, Subpart P, App. 2.

Accordingly, if Dr. Byeon's opinion is credited as true, Ms. Igou would be found disabled under

the Act as of August, 2014, because Medical Vocational Rule 201.14 requires a finding of

disabled.

Before Ms. Igou turned 50 years old, however, the Medical Vocational Rules did not

automatically require a finding of disabled if she was limited to performing sedentary work.

Thus, whether Ms. Igou was disabled as defined by the Act is dependent upon the extent to

which her functional limitations erode her ability to perform a full range of sedentary work.

More specifically, Ms. Igou was 48 years old on her alleged onset date of July 1, 2012, which

means she would not be found disabled under the Medical Vocational Rules if she could perform

a full-range of sedentary work.  *Id.*  Dr. Dixon's opinions suggest that Ms. Igou cannot perform a

full range of sedentary work, or work at any level of exertion, given her non-exertional

limitations.  Thus, her non-exertional limitations may preclude her ability to work as of her

alleged onset date if the Commissioner cannot meet its burden of proving there are a substantial

number of jobs in the national economy that she can perform in light of the limitations.  But, that evidence is not in the record.

Accordingly, I cannot find Ms. Igou disabled under the Act even if I credit the evidence that the ALJ improperly evaluated as true.  The ALJ must further develop the record to determine whether Ms. Igou's non-exertional limitations require a finding that she was disabled before she turned 50 years old.  Specifically, the Vocational Expert must identify jobs in the national economy that Ms. Igou could still perform given the combination of her exertional and non-exertional limitations.

## CONCLUSION

For the reasons stated above, I find that the Commissioner's decision is not supported by substantial evidence in the record, and I REVERSE and REMAND this case to the Commissioner for additional proceedings.  Upon remand, the ALJ shall properly evaluate the opinion evidence of Dr. Byeon and Dr. Dixon, as well as the claimant's testimony.  The ALJ shall use those findings in the sequential evaluation process, which includes formulating an adequate residual functional capacity for Ms. Igou, to decide whether she is disabled.

IT IS SO ORDERED.

DATED this  24  day of April, 2017.

/s/ Michael W. Mosman
MICHAEL W. MOSMAN
Chief United States District Judge